## Case No. 12,374.

### SAUNDERS et al. v. The HANOVER.

[2 Quart. Law J. 1.]

District Court, E. D. Virginia. 1857.

COLLISION—BURDEN OF PROOF—STEAM AND SAIL—RIGHT TO COURSE.

1. The general rule in cases of collision is that the vessel proceeding in the cause for indemnification must, in order to obtain a decree in her favor, show, by preponderating evidence, that the other vessel was guilty of negligence or of some misconduct.

2. The onus of proof does not lie on the vessel proceeded against, except when a prima facie case of negligence is made out on the other side.

3. In the United States, it is the law that steamers meeting a sailing vessel, whether closehauled or with the wind free, the latter has the right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her.

4. In England the rule is that if the sailing vessel has the wind free and meets a steamer, each must put the helm aport. With this exception, the rule in the United States and England is the same.

5. The rule is clear that when two vessels are nearing each other, and there will be any hazard of striking, without a change of course, and one of them is closehauled and the other has the wind fair, it is the duty of the latter to give way, or avoid or get out of the way of the former.

6. General principles in cases where, from the courses of vessels, there is danger of collision.

In admiralty.

Chandler & Sharp, for libellants.

Macfarland, Crump & Crenshaw, for respondents.

HALLYBURTON, District Judge. This action was brought by the owners of the schooner Venus to recover compensation for losses occasioned, as is alleged in the libel, by the fault of the Hanover in running down the former vessel. The collision which gave rise

to this suit, and in consequence of which it is said the Venus and her cargo were totally lost, occurred off the coast of New Jersey, on the night of the 4th May, 1855, at about half-past 9 o'clock. It is admitted by all parties that the direction of the wind and the courses on which the two vessels were steering are correctly represented on the chart which was handed to the court by counsel; that is to say, the wind was from N. N. West, the Hanover was steering S. W. and S. with her starboard tacks on board, and the Venus N. E. and ½ E. on the larboard tack. The Venus was closehauled, and the Hanover had the wind fair, and under these circumstances, the general rule of navigation required that the latter vessel should give way or get out of the way of the former; but it is averred in defence of the Hanover that the night was so dark as to make it impossible to see the Venus further than about one or two ship's lengths, and that everything was done by her after the Venus was seen which was proper and could be done to prevent mischief, but that the latter vessel was so negligently or unskilfully navigated, that she was thrown across the bows of the Hanover, which vessel then went stern on into the starboard side of the Venus, and caused the damage of which complaint is now made, without any negligence or fault of the damaging vessel whatever.

Before we look into the testimony on these points, let us consider for a moment the law of evidence by which we are to be directed. The rule that in suits of this kind the vessel proceeding in the cause for indemnification must, in order to obtain a decree in her favor, show by preponderating evidence that the other vessel was guilty of negligence or of some misconduct, is very often referred to in the reported cases. In The Ligo, 2 Hazz. Adm. 357, Sir Christopher Robinson says: "This is a case of collision in which a vessel, the Express, has been lost in consequence of that accident, and the law will support a claim for indemnification on the part of the owners of that vessel, provided it can be shown that the loss was owing to the fault of the vessel charged as the wrong doer." And, again, in the same case: "The law required that there should be preponderating evidence to fix the loss on the party charged before the court can adjudge him to make compensation." And in The Bolina, 3 Notes of Cas. 208, it was said by Dr. Lushington that, "with regard to inevitable accident, the onus lies on those who bring a complaint against a vessel and who seek to be indemnified. On them is the onus of proving that blame does attach upon the vessel proceeded against; the onus of proving inevitable accident does not necessarily attach to that vessel; it is only when you show a prima facie case of negligence and want of due seamanship." All this is, no doubt, true; but in the application of the rule laid down, difficulties may arise which are not well settled by authority. It is not always easy to

say when a prima facie case is made out so as to shift the onus from one party to the other. When a vessel, for instance, as in the present case, shows that she was sailing close-hauled upon a wind, and was run down by another vessel having the wind in her favor and sailing free, does it devolve upon the latter, if she asserts that she was excusable on account of the darkness of the night, to plead and prove by testimony the fact upon which she thus relies for her exculpation? or is the other party obliged, in order to make out a prima facie case of negligence, to state in the first instance, and offer evidence to show, that there was light enough to have seen, if a good and sufficient lookout had been kept on board the damaging vessel?

There are not above three or four cases to be found, I believe, in the books of reports, in which anything is distinctly said in relation to what ought to be the rule of evidence in this respect, and those few seem not to be in harmony with each other. The court of admiralty in Ireland appears to have thought in the case of The Londonderry, to be found in the Supplement to 4 Notes of Cas. (page 31), that the party complaining in a suit for collision was in every instance bound to allege and prove, in order to make out even a prima facie case of negligence, that there was light enough for the vessel charged as the wrongdoer to have seen the injured vessel if she had kept a good lookout. The Londonderry, a large steamer, ran down in the night the Dolbaden Castle, a small schooner, which, in consequence of the state of the wind and tide, was nearly incapable of altering her position. And Doctor Starke in delivering the opinion of the court, distinctly states, and more than once, that the owners of the sailing vessel must prove by testimony, in order to establish even a prima facie case; and as a part of that case, that, although it was night, there was light enough for the steamer to have seen if she had not been negligent; and that unless proof of this fact should be offered in the first instance sufficient to satisfy the court in the absence of all proof to the contrary, the steamer would not be put upon her defence, or at least would not have to adduce any evidence. From what is said by Sir John Nicholl in the case of The Celt, 3 Hagg. Adm. 322, he appears to have been of the same opinion. His words are these: "Here is one vessel closehauled, and beating to the windward, and the other with the wind free and all sail set; and if it had been open daylight, it would have been prima facie the duty of the Celt to have kept clear of the Anthony, and of the Anthony to have kept on her course." I infer, however, from what is said by Doctor Lushington in the case of The Columbine, 2 W. Rob. Adm. 28, and of The Harriett, 1 W. Rob. Adm. 183, and from the modes of pleading adopted in the case of The Juliet Erskine, 6 Notes of Cas. 633, and in other cases, that a different view of the law was taken by that learned judge.

According to the principle of these decisions, as I understand them, the party charged with being in fault, if he means to offer an excuse for not complying with the general rule, must plead such excuse and sustain his plea by testimony, whether that excuse be the violence of the wind or any other cause rendering the vessel charged unmanageable, or the intense darkness of the night, making it impossible to have seen the injured vessel; and this I take to be the true principle. The Victoria, 3 W. Rob. Adm. 50; The Batavier, 2 W. Rob. Adm. 407; and The Scioto [Case No. 12,508], seem directly in point to show that, where vessels at anchor are run down by other vessels under sail, the burthen of proof is on the latter to show that they were unable to see, or that, from the vis major or some other cause over which the mooring vessel had no control, the accident could not be prevented; and if this be so, there is no apparent reason why the principle should not be extended to vessels closehauled or in any other situations, were it the duty of the other vessels, under the general rules of navigation, to avoid them. Therefore, if the Hanover alleges in her defence that the best measures were adopted after she saw the Venus that could have been taken to avoid an accident, and that she did not take other and more effectual steps at an earlier period because the Venus was not seen, and could not have been seen, in consequence of the darkness of the night, she must prove it.

Let us now review the testimony in order to get at the facts of the case. It is not pretended that any effort was made by the Hanover to avoid coming into contact with the other vessel until they were near each other, and there was danger of collision even with prudent management on both sides; but it is alleged in defence that the night was very dark, so dark that the Venus could not have been seen by a careful and vigilant lookout until the Hanover was close upon her, or any sooner than she was, and that even then there could have been no collision if the Venus had not luffed and crossed the bows of the Hanover. It is further averred that the latter vessel had a good and sufficient lookout. It is admitted that the Venus had no light. Six witnesses were examined for the defence. Five of them express the opinion that a vessel could not, in consequence of the darkness of the night, have been seen more than her length or about that distance; and one thinks that the lost vessel could not have been seen more than 100 yards, though a taller vessel might have been seen farther off.

On the other hand, the witnesses in support of the claim for damages—four in number—all express the opinion that a vessel without a light would have been visible at the distance of a mile. Supposing, then, the witnesses to be unimpeached on both sides, and equally credible, and that each one is expressing merely his opinion, the numerical preponderance on the side of the Hanover would perhaps, in

weighing the testimony, be sufficient to turn the scale in her favor. But there are several circumstances which induce me to put more confidence in the testimony of the defence than in that in support of the libel. All men are extremely liable to be biased in their opinions by their interest and their inclinations, and perhaps there is no question in relation to which an interested or prejudiced witness would be more likely to have an opinion colored by his wishes than in a question of distance between two vessels at night, because of the difficulty of forming an accurate judgment, particularly under such circumstances of alarm and excitement as attended the accident of which we are speaking. Now, all the witnesses for the Venus, without exception, were persons belonging to that vessel. They were the master, the 1st and 2d mates, and a mariner. While among those on the other side are two who may be supposed to be more free from bias than any other witnesses,—Williams who was a passenger on board the Venus, and Hazlewood. This is a consideration which should certainly have influence, and to which much weight is usually attached by courts of admiralty. In the next place, some circumstances are stated by some of the witnesses for the Hanover which, if we suppose them to be true,—and there is nothing to render them doubtful,—would justify us in relying with much confidence on their opinions. Curtis states in his deposition that he could not see some trunks which had been thrown on the deck of that vessel, and fell over them, and that several vessels were near running into her and the Venus after the collision, when the lights of the Hanover had been broken or taken down; and Hazlewood confirms this statement so far as it relates to the danger of being run down by other vessels. If this be so, it proves beyond a doubt that, whatever may have been the distance at which vessels might have been seen, they could not have been seen far enough without a light to prevent danger of collision, unless we are to presume that all vessels approaching them so nearly were unskilfully or negligently navigated.

On the other hand, there are statements in some of the depositions for the Venus which show a carelessness or inaccuracy of memory which must very considerably detract from their weight. Winter, who was on the lookout, says that vessels might have been seen a mile without lights, and yet he states that, when he first saw the Hanover with lights, she was only about a mile off, and he could not tell whether she was coming or going. He was looking out for vessels at the time, and therefore we must suppose saw the Hanover as soon as she was visible. But what is more material is his statement that the Hanover was approaching the Venus on the lee bow. This would be a very important fact if it were established, and might show that the Hanover was to blame for not putting her helm hard up instead of hard down, and that she was attempting to cross the bows of the Venus instead of passing under her stern, which would have been the case if the Hanover had been approaching to leeward instead of to the windward of the course the Venus was steering; but it is admitted that the direction of the wind and the course of the two vessels are accurately represented on the chart which was given by counsel, and the testimony in the case proves, I think, that they are so, and thus it seems to me impossible to believe that the Hanover could have been seen at any time steering for the lee bow of the Venus. She could only have been seen on the lee bow after the collision. The deposition of the master of the Venus also states that the lookout said there was a sail on the lee bow, and he, the master, looked and saw the vessel, and then he proceeds to state what occurred with any intimation that the Hanover was not approaching in that direction,—but leaving the impression that she was so. It is observable, too, that neither the master nor mate alludes to the luffing of the Venus just a few minutes before the collision, and which it will hereafter be shown, must have taken place. Both the master and the mate say an order was given to luff, but the mate says he gave the order when the Hanover was about half a mile off, and the master says an order was given by him a few minutes before the collision, and the vessels were sailing, one at the rate of more than five miles an hour, and the other more than three miles. The order by the master must have been given when they were quite or nearly half a mile apart, and the luffing of which he speaks could not have been that which happened nearly at the moment when the vessels came into contact, and which caused the Venus to be struck on the starboard instead of the larboard side. Neither of these witnesses attempts to explain how it was that the Hanover ran stem on into the starboard side of the Venus upon the supposition that the former vessel was to the windward of the latter; but both make statements calculated to leave the impression that the former vessel came up under the lee of the latter, and therefore struck her of course upon the starboard side without any fault or mismanagement of the damaged vessel. These are grave errors and omissions, and, whether they be the result of carelessness or a defect of memory or any other cause, must very much impair the force of these depositions. It is proved by Hazlewood and other witnesses that there was on the Hanover what I regard as a good lookout, and I am therefore of opinion, from all the testimony, that there was no negligence in her not seeing the Venus in time to avoid all danger of collision, and that she did not see the latter vessel sooner because the night was very dark, and there was no light on board of her.

We have now to inquire whether or no, when danger was imminent, the Hanover took such prudent, proper, and skilful measures of precaution as to exempt her from

blame. The wind, as we have said, was about N. N. W. The Venus was heading N. E. ½ E. closehauled upon a wind, and on the larboard tack; and the Hanover was steering S. W. and by S. sailing free with her starboard tacks on board to the windward of the track of the Venus, and nearing her larboard or weather bow. Under such circumstances, what ought the master of the Hanover to have done? Those rules of navigation which are intended to prevent vessels from coming into collision with each other are the same or nearly so in this country as in England, as appears from numerous decisions in the district and circuit courts of the United States, and was settled by the supreme court of the United States in the case of St. John v. Paine, 10 How. [51 U. S.] 558. It is there laid down as a general rule in relation to steamers and sailing vessels, that, "when meeting a sailing vessel whether closehauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her." In England the rule is that, if the sailing vessel has the wind free and meets a steamer, each must put the helm aport. See The Celt, 3 Hagg. Adm. 326; The City of London, 4 Notes of Cas. 40; The Rose, 2 W. Rob. Adm. 1; and The Osprey [Case No. 10,-606]. With this exception, which seems to have grown originally more out of difference between the English and American courts as to the true construction of the rule as laid down in the cases of The Shannon, 2 Hagg. Adm. 173, The Perth, 3 Hagg. Adm. 414, and some other English cases, than anything else, the rules upon the subject are the same in this country, I believe, so far as they are to be found in the books of reports, as they are in England. These rules are of course intended to apply, as is said in The City of London, The Rose, and many other cases, only when there is a chance of a collision, or as it is expressed with more accuracy in the case of The Gazelle, 2 W. Rob. Adm. 518, "when vessels must necessarily pass each other so near that by continuing their respective courses there would be risk of their coming into collision." When they are so far apart, though in sight of each other, that there is no risk whatever of their coming into contact, either may lawfully and at discretion port or starboard her helm, luff up or bear away, pass to windward or leeward astern or across the bow of the other, without any penalty.

Now the rule is clear that when two vessels are clearing each other, and there will be any hazard of striking without a change of course, and one of them is closehauled, and the other has the wind fair, it is the duty of the latter to give way or avoid or get out of the way of the former. The rule of the Trinity House, as stated in the case of The Friends, 1 W. Rob. Adm. 478, is in these words: "The recognized rule for sailing vessels is that those having the wind fair should give way to those on a wind." This regulation of the Trinity House would merely, as such, have no force here, but, as is remarked by the court in the case just referred to, the rules stated in the Trinity House regulations were certain recognized rules which had long prevailed. They are not stated as having been enacted, but as established rules. The interpretation given to this rule, then, will show what the general rule of navigation was before the regulations of the Trinity House were made, and what the rule is here. What then is that interpretation? In the case of The Gazelle, 2 W. Rob. Adm. 517, it is said by the court that "the first regulation is that sailing vessels that have the wind free shall give way to those on a wind. By the term 'giving way' is meant, I apprehend, that they shall get out of the way by whatever measures are proper for the purpose either by porting or starboarding the helm as the occasion shall require." The same construction seems to be put upon the rule in the case of The Speed, 2 W. Rob. Adm. 225; The Rose, Id. 1; Handaysyde v. Wilson, 3 Car. & P. 528. And in the case of The Osprey, before cited, the court say that whenever one vessel is to keep her course, and the other is to take the whole duty of avoiding her, the latter, whether steamer or sailing vessel, is not restricted to going to the right, but may take any course and resort to any measures which are most judicious and convenient. The supreme court of the United States says in the case of St. John v. Payne [supra] that a vessel that has the wind free or sailing before or with the wind must get out of the way of the vessel which is closehauled or sailing against it, and it has never been decided, so far as I know, that a vessel sailing free is to give way or to get out of the way of another by porting her helm invariably, or always putting it to starboard, but must do that which means to be best and safest under the circumstances of the particular case. Such being the rule, my opinion is that the master of the Hanover did precisely what he ought to have done in the situation in which he was placed.

Of course, I speak with great diffidence upon a subject in reference to which I have not much information and no experience, and where I have had but little aid from any nautical witness. Such, however, is my opinion, and such I understand to be the opinion of Capt. Lowndes, the only nautical witness who has been examined in the cause. The Hanover was approaching the Venus to windward. The latter vessel was closehauled, and the master of the Hanover could not know that she might be brought any nearer to the wind. On the other hand, the Hanover was free with her starboard tacks aboard, and could easily luff or bear away. She would therefore naturally, as it seems to me, take that course which would leave the Venus

free to alter her course in the way which might be the only possible one, and certainly would be the easiest. There was another reason however, and perhaps a stronger one, for the adoption of the steps taken by the Hanover.

It seems to be regarded as extremely improper, as a general rule, for one vessel to cross the bows of another when there is danger of contact. Thus, in the case of The Rose, 2 W. Rob. Adm. 1, the Trinity masters say: "The expression 'giving way,' means, not crossing a vessel's bows, but going under her stern." And The James Watt, Id. 279, The London Packet, Id. 217, and The City of London, 4 Notes of Cas. 40, seem to the same effect. Now, if the Hanover had put her helm hard up instead of hard down, if instead of luffing she had borne away, she must have gone directly across the bows of the Venus, and thus apparently have increased the danger. It seems to me, therefore, that the Hanover pursued the best course to avoid an accident, and adopted the measures she ought to have taken even if upon her had been the whole duty of giving way, and if, notwithstanding the vessels came together, it was not her fault; and if there were no fault on the other side the injury done must be regarded as the result of inevitable accident.

We must not forget, however, that this collision was at night, when it was very dark, and under doubtful circumstances, when each vessel might reasonably be in doubt whether she was seen by the other or not, and as to the exact direction in which the other was steering; and in such a state of uncertainty it appears to have been the duty of the vessel on the larboard tack to have given away, as well as of the other vessel. This rule seems to be well established in England, as may be seen by reference to The Ann & Mary, 2 W. Rob. Adm. 189; The Traveller, Id. 198; The Ebenezer, Id. 206; The Seringapatam, Id. 507; The Commerce, 3 W. Rob. Adm. 288; The George, 5 Notes of Cas. 368, and the same case on appeal in 6 Notes of Cas. 53; and The Rose, 2 W. Rob. Adm. 1. There is the following note to the case of The Traveller, by the reporter: "Both this and other decisions which have taken place are very important with respect to vessels engaged in the occupation in which these vessels were employed, as establishing the principle that at night it is the duty of the vessel on the larboard tack to give way to a vessel on the starboard tack, even although the latter should be sailing with the wind free." If this be so as I suppose it to be, it furnishes an additional and conclusive reason why the Hanover should not have put her helm up instead of luffing, because she had then a right to expect that the Venus would port her helm and endeavor to pass her on the larboard side. But whether it was the duty of the Venus to have borne away or no, she certainly ought not to have luffed. She should either have borne away or have kept steadily on her course, as all authorities on this point demonstrate.

Now, it is proved not only by witnesses who were on board the Hanover but by Williams also, who was a passenger on board of the Venus, that the latter vessel luffed just a few moments before the collision, and was brought athwart the bows of the former by that process; and what is stronger evidence on this point perhaps than any witness in the cause is the fact that the Venus was first struck on the starboard side, which, if the diagram already referred to be accurate, as it is admitted on all sides to be, could hardly have happened by any possibility if the Venus had not luffed as it is alleged she did. It is also expressly stated by Winter, the second mate of the Venus, that he gave an order to luff which was immediately obeyed when the vessels were about a half a mile a part, and as soon as he could discover the course of the Hanover; and the master of the former vessel affirms that he himself gave an order of the same sort a few minutes before the two vessels came into contact, so that the Venus must have luffed twice at least before she was struck; and Williams and other witnesses for the defence state it as their opinion that, if she had merely held her course without any change whatever, this unfortunate accident would never have happened; and I am inclined to agree with them in opinion. When Williams saw her first, he describes her sails as shaking in the wind, though she had not then come into contact with the other vessel. Some time must have been lost in bringing her into this position; and as a few seconds might have been enough to have enabled her to have passed the point at which the collision took place, it seems highly probable that if she had not been luffed the last time, and, more so, if she had not been luffed at all, she would have gone clear without difficulty. Indeed, the master himself, according to the testimony of Hazlewood, admitted this; and such admissions and declarations of the master of a vessel seem always to have been received in cases of this kind. The Manchester, 1 W. Rob. Adm. 62; The Virgil, 2 W. Rob. Adm. 203; The Lord Seaton, Id. 391; and The Ewell Grove, 3 Hagg. Adm. 227.

I am therefore of opinion, not only that the Hanover was blameless; but that the Venus was in fault, and that her loss is imputable to the mismanagement and bad seamanship of those who had the control of her, and to their want of caution in not having a light. I do not mean to say that the Venus was bound to carry a light, or that under the circumstances she was not so bound. As a general rule, it is true that vessels under sail are not under any obligations to have a light; yet it is said in the case of The Rose, 2 W. Rob. Adm. 4, and in The Iron Duke, Id. 378, that though there is no occasion on which it is laid down that merchant vessels ought constantly to carry lights, under certain circum-

stances undoubtedly it may be right and expedient to do so. And in the case of The Londonderry the court said, according to general principles, as settled in the case of The Rose and The Iron Duke, there is no obligation in a sailing vessel to hoist lights except when she wants a pilot. It is very true that in not hoisting a light there may be shown, under circumstances of particular cases, such evidence of gross folly or wilful neglect as to disentitle a complaint to any relief; and, after stating the testimony, the judge went on to say: "I do not think, therefore, that the neglect of the Dolbaden Castle (though far from being a subject of praise and approbation) was of that kind (the general rule of navigation being with her) as to disentitle her to sue here for damages; that is to say, I do not think the circumstances can be brought forward to non-suit the promoters or put them out of court." However this may be, there can be no doubt that whether the Venus was bound or not to have a light on the night in question, if she had none, and could not have been seen by another vessel in time to have avoided her in the darkness of the night, and was consequently run down, she can claim no damages on the ground of negligence in the vessel, provided such other vessel had a good and sufficient lookout, as the Hanover appears to have had.

It is insisted, however, that the conduct of the master of the Hanover after the accident was blameable, and wanting in humanity, in not rendering proper assistance to the damaged vessel, and in his treatment of her passengers and crew, and that the owners of the latter vessel are therefore entitled to some damages, or at least their costs in this suit. No precedent nor any authority has been produced for giving damages in such a case, though, as to costs the court has a discretionary power over them, they may doubtless be given upon a proper occasion. The only cases known to me in which this subject has been considered by any court of admiralty are The Chester, 3 Hagg. Adm. 317; The Celt, Id. 322; and The Lawrence, 7 Notes of Cas. 556. The last case was decided in 1850, by Doctor Lushington; the two others in 1836, by Sir John Nicholl. In The Chester it was unnecessary to make any decision upon the question of liability for damages for subsequent misconduct, and the court therefore expressed no opinion in relation to it; but in The Celt the judge, after directing the decree to stand over that it might be ascertained whether there was any precedent respecting the effect of subsequent misconduct in such a case, and no precedent being produced, refused to give damages upon that ground, but condemned the owner of the Celt in all costs and expenses of the suit. In the case of The St. Lawrence, Dr. Lushington, after referring to the case of The Celt, said he wanted no precedents in such a case, he wanted nothing but principle to guide him; and though pronouncing in favor of the St. Lawrence so far as

the claim for damages was concerned, he refused to give her costs. There can be no doubt, I think, of the correctness of the decision that the court has no right to give damages for such a cause. To hold otherwise would be to hold that an action might be brought against a vessel for not rendering a salvage service. If we once exclude all idea of blame, and hold the damaging vessel to be wholly free from any fault in occasioning the accident, she must be regarded as no more bound to render assistance in saving the property than any other vessel which might be near at the time and know of or see the occurrence. But no precedent can be shown, I apprehend, of a suit against any vessel passing by another vessel in distress, however near, without a proffer of aid; and there can be no better right to claim damages for that sort of misconduct in the present case than in that. If I were satisfied that the master of the Hanover had been guilty of any cruelty or neglect of the duties of common humanity, I should condemn him, or rather the owners of the vessel, as responsible for his conduct, in costs; but of this I am not satisfied. I am certainly a very incompetent judge of what aid ought to have been given or could be rendered to a vessel situated as the Venus was, and upon such a point would have been glad to have had the advice of nautical men. In the English courts of admiralty such matters are always referred to the Trinity masters.

It is proved that the master of the Venus showed a willingness to return to his vessel, and attempt to run her ashore if the master of the Hanover would follow him to land. This the latter would not agree to do; but gives as a reason, what the court cannot say is insufficient, that his vessel drew too much water, and he therefore could not venture.

It is also stated in the deposition of the master of the Venus that he requested the master of the Hanover to remain by the damaged vessel until daylight; but this statement is positively and distinctly denied in the deposition of the master of the Hanover, and he is, to some extent, supported by the testimony of the other witnesses. Nelson and Lend both speak of the conversation between the masters of the two vessels, in which it was proposed that the master of the Venus should return to her, and endeavor to strand her; but neither of them alludes to any request or desire expressed by any one that the Hanover would remain near her during the night.

This charge, then, is not proved; and, in the absence of any proof of such request or desire, I cannot impute blame to the master of the Hanover for not staying by the Venus, because I do not know and am entirely unable to say whether, as he could not follow or aid in bringing the Venus to land, it was at all likely that he would be able to do her any material service by keeping near her upon the sea, or what risk or inconvenience

the Hanover might have incurred by so doing. The chance of her floating with no one on board to direct her motions may have been thought too desperate to be worth the time and trouble of watching her. The master of the Venus seems to have thought she must go down, as no doubt she did; and if he did not desire or propose that the Hanover should remain near her during the night, the court cannot say it was her duty to have done so.

As to the language used, or said to have been used, by the master of the Hanover, however objectionable it may have been in some respects, it was not such as this court would deem it proper to punish by imposing costs or withholding them.

I do not regard it as indicative of any want of humanity or unwillingness to assist those in distress, but as uttered in a moment of great excitement, and as prompted by a desire to preserve the necessary order and discipline in a time of much confusion and alarm. If I could for an instant suppose that the speaker was actuated by any design to have left the passengers of the Venus without succour, I would, without hesitation, impose upon the Hanover the payment of the costs of suit, were they ten times what they are, but this I do not believe.

One of the witnesses deposes that some persons were attempting to cut the rigging of the Hanover, and that the master of that vessel threatened to shoot them if they would not desist; and there is nothing in the cause, so far as I have observed, to discredit this testimony. But, whether this be so or not, it must have been difficult to have ascertained at once the precise extent of the mischief, and what further harm might have been done to either vessel if they had not been speedily separated. The master of the Hanover may have feared that the rush of men and the disorder which prevailed around him would produce disastrous consequences unless he would restrain it, and under those impulses have spoken in a manner which, though we may disapprove it, we do not look upon as evidence of any indisposition to extend proper aid to the sufferers.

In the case of The Celt, the master of that vessel refused to try, though requested to do so, whether anything could be saved from the damaged vessel, and afterwards carried away the master and crew of the schooner, and landed them in a state of destitution on the coast of Ireland. In the case of The St. Lawrence, her master refused to turn about in order to make an effort to save the life of a man who had fallen overboard and was afterwards drowned. The conduct of the master of the Hanover was not like that. He ran along with the Venus for some time to afford her crew, as he affirms, an opportunity of returning to her if they pleased. Everything was removed from their vessel which they wished to take and conveniently could take away; and what could be done

to make them comfortable, it appears, was done. I do not think, therefore, that the owners of the Hanover ought to pay the costs of this action. In the view I have taken of this case, it is, of course, unnecessary to make any estimate of the value of the Venus or her cargo, or to decide whether she might or ought not to have been preserved by proper exertion on the part of her master and crew. I must say, however, as was said in the case of The Mellona, 3 W. Rob. Adm. 7, that in all cases of this kind, and under similar circumstances, the prima facie presumption of law is that the vessel was lost in consequence of the collision. They who maintain the contrary must prove it. The decree to be entered is that the libel be dismissed, and that the owners of the Venus pay the costs of this action.